# IN THE SUPREME COURT OF CALIFORNIA

JOHN BUSKER,

Plaintiff and Appellant,

v.

WABTEC CORPORATION et al.,

Defendants and Respondents.

S251135

Ninth Circuit

17-55165

Northern District of California

2:15-cv-08194-ODW-AFM

August 16, 2021

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion, in which Justice Cuéllar concurred.

Justice Cuéllar filed a dissenting opinion, in which Justice Liu concurred.

BUSKER v. WABTEC CORPORATION

S251135

Opinion of the Court by Corrigan, J.

California's prevailing wage law (Lab. Code,[1] § 1720 et seq.) is a minimum wage provision that generally applies to those employed on "public works." This case involves two questions: (1) Does publicly funded work on rolling stock, like train cars, fall under the statutory definition of "public works"? (2) Alternatively, does the work on rolling stock in this case qualify as "public work" because it is integral to other activity that itself qualifies as public work? The answer to both questions is no.

## I. BACKGROUND

The Southern California Regional Rail Authority operates a large train system known as Metrolink. In 2010, it entered into the prime contract with Parsons Transportation Group, Inc. (Parsons) to design, furnish, and install a comprehensive communications network called Positive Train Control (PTC) to prevent collisions and other dangerous train movement.

The project was publicly funded and cost over $216 million. The expansive undertaking included wayside signals, systems on locomotives and rail cars, back office servers, a communications network, and a centralized dispatching system, along with software development and installation. The system required integration of various components located on trains, at

_____

[1] Further unspecified section references are to the Labor Code.

1

wayside sites along tracks, and at centralized control centers. While the undertaking was done under a public *contract*, not all aspects of the enterprise necessarily qualify as a public *work*. "Public works" is a term of art defined by statute.[2] (See § 1720 et seq.)

Only two aspects of the project are at issue here: field work and onboard work.[3] Field work included building and outfitting radio towers on land adjacent to train tracks. The labor required trenching, driving forklifts, operating cranes, and welding. Onboard work primarily involved installing electronic components on the train cars and locomotives themselves.

Defendant Wabtec Corporation (Wabtec) subcontracted to install system components on locomotives and rail cars. The subcontract incorporated various provisions of the prime contract, including compliance with applicable prevailing wage laws. Wabtec performed no field work.

Plaintiff John Busker was one of over 100 Wabtec workers assigned to the project. For approximately two years, he did traditional electrical onboard installation. Wabtec did not pay prevailing wages to any of its employees.

Busker filed a prevailing wage complaint against Wabtec with the Division of Labor Standards Enforcement (DLSE), a division of the Department of Industrial Relations (Department)

---

[2] The prevailing wage law uses the plural term "public works" as well as the singular term "public work." (See §§ 1720, subd. (a)(1) & (2), 1770, 1771, 1772.) This opinion uses the terms interchangeably.

[3] Field work is referred to as "field installation work" in the contract. This opinion uses the abbreviated term to avoid unnecessary repetition.

that enforces California's labor laws. (See *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 555.) In 2015, the DLSE issued a civil wage and penalty assessment of $6,468,564 against Wabtec for failure to pay prevailing wages.[4] Wabtec requested review by the Labor Commissioner, arguing that the prevailing wage law does not apply to the onboard work because the law covers only work performed on or to real property, not "rolling stock"[5] like locomotives and buses.

After review, the DLSE vacated the assessment and took no further action. In this case, a DLSE officer testified his superior directed him to vacate the assessment because, historically, work performed on rolling stock is not covered by the prevailing wage law. The Department never formally determined whether the prevailing wage law covers onboard work.

While the review of the assessment was pending, Busker sued Wabtec and the project manager[6] in state court for failing

---

[4] The assessment consisted of $5,786,349 in wages due plus related penalties of $682,215. The assessment order did not contain any factual or legal basis for the DLSE's finding, aside from spreadsheets containing the wage and penalty calculations.

[5] The prevailing wage law does not mention "rolling stock." Black's Law Dictionary defines the term as "[m]ovable property, such as locomotives and rail cars, owned by a railroad." (Black's Law Dict. (11th ed. 2019) p. 1592, col. 1.) In the federal "Buy America" regulations, rolling stock has a much broader definition that includes "buses, vans, cars, railcars, locomotives, trolley cars and buses, and ferry boats, as well as vehicles used for support services." (49 C.F.R. § 661.3 (2021).) This opinion uses the term broadly to encompass all types of conveyances.

[6] We refer to the defendants collectively as Wabtec.

to pay prevailing wages. Wabtec removed the action to federal district court and sought summary judgment urging Wabtec's onboard work was not subject to prevailing wage requirements. The court granted the motion, reasoning that only workers "employed on [a] project involving fixed works or realty" are entitled to prevailing wages. It also rejected Busker's other argument that the onboard work fell within the scope of the prevailing wage law under section 1772 as work done "in the execution" of the overall project to install the PTC system. The court concluded that section 1772 still requires the applicable contract to be one for "public work," and the Wabtec subcontract, limited to rolling stock, did not qualify.

Busker appealed and we accepted a request from the United States Court of Appeals for the Ninth Circuit to decide a question of state law. (Cal. Rules of Court, rule 8.548(a).) That court posed the question as follows: "Whether work installing electrical equipment on locomotives and rail cars (i.e., the 'on-board work' for Metrolink's PTC project) falls within the definition of 'public works' under California Labor Code § 1720(a)(1) either (a) as constituting 'construction' or 'installation' under the statute or (b) as being integral to other work performed for the PTC project on the wayside (i.e., the 'field installation work')."

## II. DISCUSSION

### A. *Overview of California's Prevailing Wage Law*

Economic conditions in the Great Depression prompted the passage of prevailing wage laws designed to ensure that workers employed on public building programs would be paid daily wages commensurate with those prevailing in the local area for work of a similar character. (See *Universities Research*

*Assn. v. Coutu* (1981) 450 U.S. 754, 773–774; *Azusa Land Partners v. Department of Industrial Relations* (2010) 191 Cal.App.4th 1, 14–15.)  The goal was to give local contractors and labor a fair opportunity to work on public building projects that might otherwise be awarded to contractors who hired cheaper out-of-market labor.  (*Universities Research Assn. v. Coutu,* at p. 774.)

The prevailing wage law was enacted in 1931 as an uncodified measure.  (1931 Act; Stats. 1931, ch. 397, p. 910.)  A federal counterpart, the Davis-Bacon Act, was enacted the same year.  (40 U.S.C. § 3141 et seq.)  In 1937, California's prevailing wage law was codified as part 7 of the newly established Labor Code.  (Stats. 1937, ch. 90, pp. 185, 241.)

"The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985 (*Lusardi*).)  "This general objective subsumes within it a number of specific goals:  to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees."  (*Id.* at p. 987.)  Courts liberally construe the law to fulfill its purpose. (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949–950 (*City of Long Beach*).)

Generally, those employed on public works must be paid at least the prevailing rate of per diem wages paid locally for

work of a similar character.[7]   (§ 1771.)   A contractor or subcontractor that does not pay the prevailing rate is liable for the deficiency and subject to a penalty.  (§ 1775.)  The obligation to pay prevailing wages has a statutory basis independent of any contractual requirement.  (*Lusardi*, *supra*, 1 Cal.4th at pp. 981– 982.)  A contractor must pay prevailing wages when required, even if it has not contractually agreed to do so.  (*Id.* at p. 988.)

B.     *Onboard Work as "Construction" or "Installation" Under Section 1720, Subdivision (a)(1)*

The first question is whether the onboard work done exclusively on locomotives and rail cars (rolling stock) falls under the definition of "public work."  An examination of the relevant statute establishes that it does not.

The prevailing wage law has its roots in the Depression Era.  Then, as now, when a governmental entity decided to build a courthouse in the town square, a great many aspects of that project would come into play.  Architects in Los Angeles might devise the plans.  Lawyers in San Francisco might draft the contracts.  But when it came time to excavate the basement, lay the foundation, and raise the walls, local daily wage workers would be hired to do the work.  It was their livelihood that the

---

[7] Prevailing wage requirements do not apply to work carried out by a public agency with its own labor force or to projects with a dollar value of $1,000 or less.   (§ 1771.)   A public entity "awarding any contract of public work, or otherwise undertaking any public work," must obtain the local prevailing rate for each craft, classification, or type of worker needed to execute the contract. (§ 1773.)  The applicable wage rates must be included in the call for bids, in bid specifications, and in the contract or, alternatively, those documents must specify that the rates are on file in the public entity's principal office.  (§ 1773.2.)

prevailing wage law was designed to protect and enhance. In the decades since, the law has been amended a number of times to include or exclude certain kinds of work. It has never been modified to embrace work on rolling stock.

The term of art "public works" is defined in section 1720, subdivision (a), which begins by providing, "[a]s used in this chapter, 'public works' means: . . . ." It then sets out eight numbered subdivisions that define the term in various contexts. (§ 1720, subd. (a)(1)–(8).) The operative definition here is found in section 1720, subdivision (a)(1) (hereafter section 1720(a)(1)).[8]

Under section 1720(a)(1), "public works" means "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds . . . ."[9] There are three basic elements to a "public work" under section 1720(a)(1): (1) "construction, alteration,

---

[8] See, e.g., other subdivisions that involve irrigation systems, but not their operation (§ 1720, subd. (a)(2)); some street and sewer improvements (§ 1720, subd. (a)(3)); laying of carpet (§ 1720, subd. (a)(4) & (a)(5)); and tree removal (§ 1720, subd. (a)(8)).

[9] Subdivision (a)(1) of section 1720 also contains an exception not relevant here and then goes on to discuss the scope of the terms "construction" and "installation," as follows: "For purposes of this paragraph, 'construction' includes work performed during the design, site assessment, feasibility study, and other preconstruction phases of construction, including, but not limited to, inspection and land surveying work, regardless of whether any further construction work is conducted, and work performed during the postconstruction phases of construction, including, but not limited to, all cleanup work at the jobsite. For purposes of this paragraph, 'installation' includes, but is not limited to, the assembly and disassembly of freestanding and affixed modular office systems."

demolition, installation, or repair work"; (2) that is done under contract; and (3) is paid for in whole or in part out of public funds. (*Ibid.*) Busker argues that the onboard work fell under this definition as either "construction" or "installation." It is undisputed that the work was done under contract and paid for with public money.

Familiar principles guide our interpretation of section 1720(a)(1). Our fundamental task is to determine the Legislature's intent to effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. We examine that language, not in isolation, but in the context of the statutory framework as a whole to discern its scope and purpose and to harmonize the various parts of the enactment. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Ibid.*) The wider historical circumstances of a law's enactment may assist in ascertaining legislative intent, supplying context for otherwise ambiguous language. (See *California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844.)

While neither "construction" nor "installation" is explicitly defined in the prevailing wage law, *City of Long Beach* considered various definitions of the term "construction." (*City of Long Beach*, *supra*, 34 Cal.4th at p. 951.) Those include " 'the action of framing, devising, or forming, by putting together of parts; erection, building' " (*ibid.*, quoting 3 Oxford English Dict. (2d ed. 1989) p. 794) and " '[t]he act of putting parts together to

form a complete integrated object.' " (*City of Long Beach*, at p. 951, quoting Webster's 3d New Internat. Dict. (2002) p. 489, col. 2.) Because neither definition confines the term "construction" to the building of a *structure*, onboard work could arguably fall within these definitions.

Similarly, dictionary definitions of "installation" do not limit that activity to a fixed work on real property. Webster's Third New International Dictionary defines one sense of "installation" as "the setting up or placing in position for service or use." (Webster's 3d New Internat. Dict., *supra*, at p. 1171, col. 1.) That broad definition could conceivably encompass onboard work.

However, words used in a statute are not considered in isolation. They are construed in context, honoring the statutory purpose, and harmonizing statutes relating to the same subject to the extent possible. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) Here, the general terms "construction" and "installation" are offered as categories of "public works," a term which itself has a generally understood meaning that substantially predates the prevailing wage law. It is *that* definition that gives context to the Legislature's use of the terms construction and installation.

Dictionary definitions dating back to the turn of the 20th century uniformly define "public works" as fixed works on real property. The term is defined in a 1906 edition as "all fixed works constructed for public use, as railways, docks, canals,

water-works, roads, etc."**[10]** (6 Century Dict. & Cyclopedia (1906) p. 4830, col. 2.)

The 1925 edition of California Jurisprudence, published in the decade before the prevailing wage law enactment, observed: "The term 'public works' may be said to embrace all fixed works constructed for public use or protection. . . . In view of the acts authorizing public improvements the term probably includes bridges, waterworks, sewers, light and power plants, public buildings, wharves, breakwaters, jetties, seawalls, schoolhouses and street improvements." (22 Cal.Jur. (1925) Public Works, §2, pp. 74–75, fn. omitted.) *Swanton v. Corby* (1940) 38 Cal.App.2d 227, 230, relied upon this definition to hold that installing a two-way police radio system did not constitute a public work within the meaning of a law requiring competitive bidding. There, the relevant statutory scheme applied to the " 'erection, improvement, and repair of all public buildings and works . . . .' " (*Id.* at p. 229.) The court concluded the radio system was analogous to "furniture and furnishings," which had "never been held to be 'public works.' " (*Id.* at p. 230.) While *Swanton* did not involve the prevailing wage law, it did rely on the established common understanding of public works to interpret the otherwise undefined terms " 'erection, improvement, and repair' " as work associated with fixed works on real property. (*Id.* at p. 229.)

---

**[10]** More recently, in the 2002 edition of Webster's Third New International Dictionary, "public works" is defined as "fixed works (as schools, highways, docks) constructed for public use or enjoyment . . . ." (Webster's 3d New Internat. Dict., *supra*, p. 1836, col. 3.)

Busker does not dispute that dictionary definitions of public works refer to fixed works on realty. But he claims those definitions are irrelevant, citing the principle that a court should not rely on a dictionary definition of a term *specifically defined in the statute*. (See *Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1189.) That principle is valid but does not assist here. The dictionary definitions of "public works" are not offered *in lieu of* a statutory definition. Instead, they provide context to the terms "construction" and "installation" used in the statute to generally describe kinds of public works. While section 1720(a)(1) has been amended over the years to include examples of "construction" and "installation," nowhere does it provide a general definition of the terms, which could have very broad meanings if context is ignored. For example, "construction" might be considered to include the building of a public ferry boat; "installation" might be conceived as downloading software; "alteration" could be read to include clothing modification; and "repair" might be applied to overhauling a bus. Nothing in standard dictionary definitions would preclude those interpretations. However, " ' "words have no meaning apart from the world in which they are spoken." ' " (*State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1296.) The words say what they say: their meaning is understood from the context in which they are used.

An examination of the original enactment and later codification of the prevailing wage law provides that context. As originally enacted, the prevailing wage law said only that certain "construction or repair work . . . shall be held to be 'public works' within the meaning of this act." (Stats. 1931, ch. 397, § 4, p. 912.) The original prevailing wage law did not include the terms "alteration," "demolition," or "installation."

But the original statutory language did help illustrate the scope of public works. In referring to the relevant "locality" for determining the prevailing wage rate, it defined " 'locality' " as the "city and county, county or counties in which the *building, highway, road, excavation, or other structure, project, development or improvement is situated . . . .*" (Stats. 1931, ch. 397, § 4, p. 912, italics added.) The italicized words suggest that the term "public works" was limited to fixed works situated on or attached to land.[11] In that context, "construction" and "repair" under the law's original enactment appear limited to labor performed on fixed works.

The prevailing wage law, codified in 1937, continued to apply to specified "[c]onstruction or repair work." (§ 1720, subd. (a), as enacted by Stats. 1937, ch. 90, p. 241.) However, the definition of "locality" for rate determination was simplified to refer to the "county in which the public work is done." (§ 1724, as enacted by Stats. 1937, ch. 90, p. 241.) While the omission of

---

[11] Although the term "project" might be interpreted more broadly, it is part of a list of terms that would generally be understood to be limited to fixed works. Under the principle of "*noscitur a sociis* (it is known by its associates) '. . . a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to other items in the list.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307.) To interpret "project" as something other than a fixed work would render that term markedly different from the other listed items. The *noscitur a sociis* principle, like other canons of statutory construction, is merely an aid in ascertaining legislative intent. (See *People v. Garcia* (2016) 62 Cal.4th 1116, 1124.) While its application does not compel an interpretation of "project" that is limited to fixed works, it nevertheless supports giving the term that more restricted meaning.

terms like "building" or "road" in the definition of "locality" could potentially suggest an intent to broaden the scope of "public works," nothing else in the 1937 legislation would support such a conclusion. The codified provision did not substantively change the definition of "construction" and "repair" as types of "public works." (Compare Stats. 1931, ch. 397, § 4, p. 912 with § 1720, subd. (a) as enacted by Stats. 1937, ch. 90, p. 241.)

Indeed, the Legislature gave no indication it intended to confer on the terms "construction" or "repair" a more expansive meaning when it codified the existing law. If the Legislature had intended such a departure from the well-established understanding of the term "public work," one would expect that intent to be reflected in the statutory history, rather than requiring divination from a simple modification to an ancillary provision. (See *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482.) In fact, the legislative history points to a contrary conclusion. In 1936, the California Code Commission (Commission) prepared a Proposed Labor Code for the Legislature's consideration. In a note to proposed section 1720, the Commission explained that its draft of section 1720, subdivision (a) was taken "verbatim" from the analogous construction and repair provision in the original 1931 Act. (Cal. Code Com. note, Proposed Labor Code (1936), foll. § 1720, p. 85.) It is reasonable to conclude, then, that the ultimate codification reflected the Legislature's intent to embrace the established understanding of the term "public work" as the context in which the terms construction and repair were used.

Nevertheless, Busker claims that *subsequent* amendments establish that the Legislature sought to give "public works" a broader connotation than the original common usage. He notes that a 2000 amendment to section 1720(a)(1)

included preconstruction work within the definition of "construction." He argues this amendment "evidences . . . the Legislature's intent to give 'construction' a broad meaning," citing *Oxbow Carbon & Minerals, LLC v. Department of Industrial Relations* (2011) 194 Cal.App.4th 538, 549 (*Oxbow*). The amended language specified that " 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work." (§ 1720, former subd. (a), as amended by Stats. 2000, ch. 881, § 1, p. 6517.) While the 2000 legislation may have enlarged the scope of "construction" to include the design and preconstruction phases of a construction project, it did not purport to change the settled understanding of the term "public work" to cover activity divorced from fixed works on real property. As *Oxbow* itself recognized, the legislation did not purport to *define* construction but merely explained the scope of the term.[12] (*Oxbow*, at p. 548.)

Nothing in the 2000 amendment signals an intent to uncouple the term "construction" from the context of "public work." The examples of work that are included in "construction," like land surveying, are consistent with a definition of "construction" related to land-based activity. The legislative history of the 2000 amendment confirms that it was

---

[12] In 2014, the scope of "construction" in section 1720(a)(1) was again amended to encompass "work performed during the postconstruction phases of construction, including, but not limited to, all cleanup work *at the jobsite*." (Legis. Counsel's Dig., Assem. Bill No. 26, Stats. 2014, ch. 864, italics added.) Like the 2000 amendment, the statutory language clarifying that postconstruction work falls within the scope of section 1720(a)(1) does not change the fundamental understanding of what public work "construction" entails.

intended to reflect the Department's existing practice of including "construction inspectors and land surveyors among those workers deemed to be employed upon public works . . . ." (Sen. Com. on Labor & Employment, 3d reading analysis of Sen. Bill No. 1999 (1999–2000 Reg. Sess.) as amended Aug. 23, 2000, p. 2.)

Busker also contends that the 2001 addition of the word "installation" to section 1720(a)(1) signaled an intent to broaden the scope of that section. Again, the legislative history suggests otherwise. The purpose of the legislation was to codify then-existing interpretations by the Department treating installation of fixtures on real property as part of the construction process. (Cal. Dept. of Industrial Relations, Enrolled Bill Rep. on Sen. Bill No. 975 (2001–2002 Reg. Sess.) prepared for Governor Davis (Sept. 20, 2001), p. 2.) The Legislature was concerned that a future administration might "rescind the [Department's] precedential determinations" and exclude installation work as not "ris[ing] to the level of construction . . . ." (*Id.*, p. 3.) Thus, the addition of "installation" to section 1720(a)(1) should not be interpreted as expanding the scope of public works to rolling stock. Instead, it was merely intended to confirm that the installation of fixtures *on land* is part of the "construction" process.

In 2012, the Legislature again amended section 1720(a)(1) to clarify that "[f]or purposes of this paragraph, 'installation' includes, but is not limited to, the assembly and disassembly of freestanding and affixed modular office systems." (Stats. 2012, ch. 810, § 1.) Seizing upon the reference to "freestanding" systems, Busker contends the Legislature has rejected the notion that an "installation" must involve "fixed works or work that is 'affixed' or 'bolted' to realty . . . ." Busker reads too much

into the amendment. The change was enacted to overrule a specific line of Department decisions that treated the assembly or disassembly of *modular office systems* as "installation" work only if the systems were bolted, secured, or otherwise mounted to real property. (Assem. Com. on Labor & Employment, Analysis of Assem. Bill No. 1598 (2011–2012 Reg. Sess.) as introduced Feb. 6, 2012, p. 2.) The legislative history explains that the process of assembling freestanding office systems, like cubicles, involves work analogous to installing modular walls secured to a structure. (*Id.* at p. 3.) The legislation sought to eliminate what was viewed as an unwarranted distinction between fixed and freestanding modular office systems. The amendment was limited to that aim. Even after the 2012 amendment, aside from modular office systems, the Department continues to apply the rule that "installation" means "bolting, securing or mounting of fixtures to realty."[13]

In his dissent, Justice Liu argues that modular office systems are like rolling stock in that they "can be easily moved and transported to other locations." (Dis. opn. of Liu, J., *post*, at p. 8.) However, there is no indication that the *moveable* aspect of modular office systems motivated the amendment to section 1720(a)(1). The Legislature's focus was on the nature of the work that takes place in a structure, not on the fact the office systems could be easily moved. Regardless of whether a modular system is fixed or freestanding, it remains the case that

---

[13] *County-Sponsored Messages on Private Billboards*, Department of Industrial Relations, PW Case No. 2015-15 (Sept. 9, 2016) page 3 <https://www.dir.ca.gov/OPRL/coverage/year2016/2015-015.pdf> [as of Aug. 16, 2021].) The Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

office systems are installed in *buildings*. The work takes place in a fixed structure on land. The same is not true of installation performed on train cars. Nothing in the 2012 amendment suggests the Legislature sought to include rolling stock. If the Legislature had intended the statute to broadly cover all installation projects beyond those on real property, it could have easily said so.

Busker contends that if the Legislature intended "public works" to refer exclusively to construction projects involving fixed works on realty, it knew how to do so. He points to Government Code section 4002, which defines " 'public work' " for purposes of record-keeping requirements to mean "the construction of any bridge, road, street, highway, ditch, canal, dam, tunnel, excavation, building or structure . . . ." He also cites Public Contract Code section 1101, which defines " '[p]ublic works contract' " as "an agreement for the erection, construction, alteration, repair, or improvement of any public structure, building, road, or other public improvement of any kind." According to Busker, the fact that the Legislature defined "public work" to mean only certain construction projects on real property in the Government and Public Contract Codes shows that it did not intend a similar meaning in section 1720(a)(1), which omits any reference to fixed works or real property. The contention fails.

Busker relies on the principle that " 'when different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343.) That principle is inapplicable here. The definitions he cites are not contained in subdivisions that adjoin section 1720(a)(1) or even in neighboring statutes in the

17

Labor Code. Instead, they are found in entirely separate codes. They were also not enacted contemporaneously with the statutory language at issue here. Public Contract Code section 1101 was enacted in 1982. (Stats. 1982, ch. 1120, § 3, p. 4046.) Government Code section 4002's record-keeping provisions derive from an uncodified statute enacted in 1923. (Stats. 1923, ch. 448, § 1, p. 1053.) The inference Busker seeks to draw is unsupported.

There is no reason to believe the Legislature deliberately defined "public works" in the prevailing wage law to distinguish it from definitions contained in other codes enacted at different times. Instead of suggesting by implication that "public works" as used in the prevailing wage law is broad enough to encompass rolling stock, the definitions contained in the Government Code and Public Contract Code tend to confirm the common understanding that "public works" generally refers to fixed works on real property.

Indeed, within the prevailing wage law, the Legislature defined " '[p]ublic works project' " in section 1750, subdivision (b)(1) to mean "the construction, repair, remodeling, alteration, conversion, modernization, improvement, rehabilitation, replacement, or renovation of a *public building or structure*." (Italics added.) The definition is limited to fixed works. Section 1750 speaks to a narrow circumstance to authorize a private right of action by the second lowest bidder on a public works project when the successful bid was premised upon a violation of the law for which the successful bidder was convicted. (§ 1750, subd. (a)(1).) The definition of " '[p]ublic works project' " in the narrow context of section 1750 was enacted long after the 1930's codification of the Labor Code. Nevertheless, it tends to demonstrate that the term "public works" as used in the

18

prevailing wage law is still generally confined to work on buildings or other structures. The Legislature may, of course, define "public works" more broadly. But there is nothing to suggest the Legislature has thus far intended to expand the term as used in section 1720(a)(1) beyond fixed works on land.

The New York case of *De La Cruz v. Caddell Dry Dock & Repair Co.* (2013) 21 N.Y.3d 530 (*De La Cruz*) declined to employ the common understanding that "public works" is limited to labor on land. (See dis. opn. of Liu, J., *post*, at p. 5.) However, the particular state law it applied was worded and structured differently from California's statutory scheme. *De La Cruz* held that New York's law covers work performed on various boats used for public purposes. (*De La Cruz*, at pp. 538–539.) The New York court's holding is, of course, not binding. Further, its analysis provides no assistance.

First, unlike California's law, which limits the definition of "public works" to defined categories like construction and installation (see § 1720 et seq.), New York's prevailing wage scheme contains no definition of "public works." (See N.Y. Labor Law, § 220(3).) New York's law is unique in this respect. (Johnson, *Prevailing Wage Legislation in the States* (Aug. 1961) 84:8 Monthly Lab. Rev. 839, 841.) Confronted with a statute that did not define the term, the New York court created a three-pronged test to assess whether a *project* is subject to prevailing wage requirements. (*De La Cruz, supra*, 21 N.Y.3d at p. 538.) Under the *De La Cruz* test, New York's law may apply if the "*project* . . . primarily involves construction-like labor . . . ." (*Ibid*, italics added.) This definition, focusing not on the specific labor but the project for which it is done, sweeps more broadly than the expressly defined categories of "public works" in California's prevailing wage law. Further, the New York court

focused on its statutory scheme and state constitution, which specified that the applicable prevailing wage is based on the locality where the " 'public work is to be situated, erected or *used.'* " (*Id.* at p. 535, some italics omitted.) Whereas a boat used for a public purpose would not be described as " 'erected,' " the court observed that the terms " 'situated' " and " 'used' " could apply. (*Ibid.*) There is no similar language in California's statute defining the locality in which public work is performed.[14] (See § 1724.)

*De La Cruz* also purported to rely on federal authority detaching the understanding of "public works" from work on land.[15] (*De La Cruz, supra*, 21 N.Y.3d at p. 535.) It pointed to a case decided more than a century earlier in which the United States Supreme Court concluded it was not bound to read the term " 'public work' " as "confined to work on land." (*Title*

---

[14] It will be recalled that California's 1937 codification omitted the previous use of the term "project" in describing the locality in which the work is done. (See *ante*, at pp. 12–13; § 1724.)

[15] *De La Cruz* reviewed dictionary definitions of " 'public works' " from 1891 to 2013. It observed that "illustrative examples given in dictionary entries are frequently fixed structures . . . ." (*De La Cruz, supra*, 21 N.Y.3d at p. 538.) The court went on to opine: "[I]t is clear that the notion that a 'public work' must be attached to the land is not part of [the] central meaning" of the term. (*Ibid.*) However, *all* of the illustrative examples in the dictionary entries quoted in *Del La* Cruz are fixed works: " '[s]tructures (such as road or dams),' " " 'public buildings, roads, aqueducts, parks, etc.,' " " 'roads, railways, bridges, etc.,' " and " 'schools, highways, docks.' " (*Id.* at p. 537.) *De La Cruz* relegated to a footnote a definition that explicitly incorporates " 'fixed' " in the definition of "public works." (*Id.* at p. 538, fn. 5.) The dictionary definitions cited in *De La Cruz* support rather than undermine the common understanding that "public works" is generally limited to fixed works on real property.

*Guaranty & Trust Co. of Scranton v. Crane Co.* (1910) 219 U.S. 24, 33.) This reliance is tenuous. *Crane* did not involve a question of prevailing wage entitlement. Aside from acknowledging that "public works usually are of a permanent nature," *Crane* focused solely on the meaning of the word "public." (*Ibid.*) These points distinguish *De La Cruz* from the question we encounter. An interpretation that considers the history of California's prevailing wage law along with the historical meaning of "public works" supports an interpretation that generally limits the term to labor performed on fixed works.

This interpretation is confirmed in determinations made by the Department, which has consistently excluded work on rolling stock. For example, in a 1990 coverage determination, the Department's director concluded that the repair of police boats was not a public work, reasoning that the term has been construed "as having a restricted meaning as applying to work done on fixed works for public use or production." (Dept. of Industrial Relations, Director Ron Rinaldi, letter to Port of San Diego Section Chief Kenneth E. White, June 26, 1990.) Similarly, in 1994, a public agency sought prevailing wage determinations for contracts involving ship repairs. The Department "determined, consistent with previous court rulings and opinions from the Attorney General's Office, that maintenance/repair of rolling stock, i.e. vehicles, vessel[s], rail cars, etc., is not covered under the prevailing wage laws." (Dept. of Industrial Relations, Div. of Labor Statistics & Research Chief Dorothy Vuksich, letter to Attorney Madeline Chun, March 18, 1994.) The Department has also declined to apply the prevailing wage law to seat installation on rail cars and the installation of equipment on police motorcycles.

The Department twice concluded that work similar to the onboard work here was not covered under the prevailing wage law. One situation concerned the installation and testing of equipment on Bay Area Rapid Transit cars. Another involved the installation of a radio system for the Southern California Rapid Transit District. There, work installing the radio system "*in buildings and other structures*" was determined to fall within the scope of the prevailing wage law while installation in "trains, buses, and other vehicles" was not. (Dept. of Industrial Relations, Industrial Relations Counsel James M. Robbins, mem. to Asst. Labor Commissioner Simon D. Reyes, Dec. 28, 1987, italics added.)

Attorney General opinions also support excluding work on rolling stock. In 2012, the Attorney General concluded that the term "public works" as used in various statutory schemes, including section 1720(a)(1), "comport[s] with the common usage and ordinary meaning of 'public works' as reflected in dictionary definitions" that define the term as " 'fixed works (as school, highways, docks) constructed for public use . . . .' " (95 Ops.Cal.Atty.Gen. 102, 108 (2012).) Over 50 years of Attorney General opinions contain similar reasoning. (See 69 Ops.Cal.Atty.Gen. 300, 305 (1986); 25 Ops.Cal.Atty.Gen. 153, 154 (1955).)

The parties strenuously debate how much deference we should pay to the Department's decisions, which do not have precedential effect. (See *Kaanaana v. Barrett Business Services* (2021) 11 Cal.5th 158, 179.) It is true that "[d]eference to administrative interpretations always is 'situational' and depends on 'a complex of factors' [citation], but where the agency has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to

correspondingly greater weight." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436.)

We need not be drawn too deeply into this thicket. Our task is to discern the legislative intent. In that regard, the most pertinent fact is that the Department's interpretation has been long-standing and consistent. The same is true of the Attorney General opinions. Indeed, Busker cites not a single example in which the Department or the Attorney General has ultimately concluded that work on rolling stock is covered by the prevailing wage law.[16]

Of course, simply because an administrative interpretation has endured for decades does not mean it is correct. The ultimate responsibility for the construction of a statute rests with the court. An agency's interpretation is just one of several tools that may assist the court. (*City of Long Beach*, *supra*, 34 Cal.4th at p. 951.) Nevertheless, " ' "[c]onsistent administrative construction of statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight and will not be overturned unless clearly erroneous." ' " (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1012.) Here, the long-standing administrative interpretations

---

[16] Busker claims the Department has been inconsistent in its approach in this very case, citing the DLSE's release of this assessment only after initially concluding prevailing wages were owed for the onboard work. But that initial assessment was quickly vacated because it was found to be inconsistent with long-standing policy. The sequence of events here does not indicate that the policy has itself been inconsistent over time. It reflects the Department's adherence to its established interpretation.

are not clearly erroneous but instead are consistent with this court's construction of the relevant statutory language. They are significant because they tend to confirm the common understanding of "public works" that excludes labor on rolling stock. There is no indication in the record before this court that the administrative construction has vacillated over time or that there has been any call for the Legislature to step in and either confirm or reject this established approach.

It might be argued that paying the prevailing wage for onboard work serves the general purposes of the prevailing wage law. (See *Lusardi, supra,* 1 Cal.4th at p. 985.) Of course, there are many specific ways to serve that general purpose. Our interpretation is dictated by the relevant language in the statutory scheme. The prevailing wage law has never been applied to *all* work financed by public funds. The Legislature has explicitly limited the protection to labor defined as "public work." The application of the law will necessarily involve line-drawing exercises that distinguish between types of work that may be similar in many respects.

Further, there is at least some reason to believe the Legislature intended to treat work performed on rolling stock differently from that done on fixed works. One of the primary purposes of the law is to protect local labor markets from cheaper outside labor. (See *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555.) Paying the prevailing wage to workers constructing a public building located in a particular city or county obviously serves that purpose. But work on rolling stock could conceivably be performed almost anywhere, then delivered to wherever it might be used. This practical reality raises a question about whether the law's purpose is served by paying prevailing wages

to workers that may be far away from the location of the governmental entity paying for the work. It also raises significant administrative concerns. Does the law apply to someone working on a high-speed rail car in a different state? If so, what is the relevant locality for purposes of calculating the prevailing wage and including those rates in the bidding and contracting process? (See §§ 1724, 1773, 1773.2.) At least for purposes of the prevailing wage law, the distinction between labor performed on fixed works and that done on rolling stock is not an arbitrary one.

The rule favoring liberal construction is subject to an important proviso: Courts " 'cannot interfere where the Legislature has demonstrated the ability to make its intent clear and chosen not to act [citation].' " (*City of Long Beach*, *supra*, 34 Cal.4th at p. 950.) For the reasons explained above, "construction" and "installation" in section 1720(a)(1) are generally restricted to activities associated with fixed works on land. Where the Legislature has expanded the meaning of "public works" to activities that do not directly involve construction work, like refuse hauling (§ 1720.3) or the delivery of concrete (§ 1720.9), it has done so with narrowly defined provisions that involve tasks intimately connected to fixed works on real property. The Legislature has had ample opportunity to expand the understanding of "public works" to include work on rolling stock, but it has not done so.

C.    *Onboard Work as "Integral" to Field Work*

Busker argues that even if the onboard installation does not independently meet the definition of "public work," it is still subject to the prevailing wage law because it is integrally related to building the towers on the trackside, which is

indisputably "public work." The Ninth Circuit asked us to consider Busker's argument. As we explain, the onboard installation labor is not transformed into "public work" merely because the railcar and locomotive components operate together with the towers built on land next to the tracks.

The Ninth Circuit identified two lines of cases that may bear upon the question. First, it referenced a group of opinions that frame the inquiry as whether the work at issue "is integrated into the flow process of construction." (*Sheet Metal Workers' Internat. Assn., Local 104 v. Duncan* (2014) 229 Cal.App.4th 192, 206 (*Sheet Metal*); see also *Williams v. SnSands Corp.* (2007) 156 Cal.App.4th 742, 752 (*Williams*); *O.G. Sansone Co. v. Department of Transportation* (1976) 55 Cal.App.3d 434, 443–444 (*Sansone*).) These cases turn on the application of section 1772, which provides: "Workers employed by contractors or subcontractors in the execution of any contract of public work are deemed employed upon public work." Under the approach to section 1772 taken in this case law, coverage under the prevailing wage law extends "to activities not statutorily defined as 'public work,' so long as that labor is integrated into construction or other defined public work." (*Mendoza v. Fonseca McElroy Grinding Co., Inc.* (Aug. 16, 2021, S253574) __ Cal.5th __, [pp. 6–7] (*Mendoza*).)

This body of law cannot aid Busker. In *Mendoza*, a decision filed concurrently with this opinion, we reject the interpretation of section 1772 derived from *Sansone*, *Williams*, and *Sheet Metal*. *Mendoza* disapproves those cases to the extent they interpreted section 1772 to expand the statutory definitions of "public works." (*Mendoza, supra*, ___ Cal.5th at ___ [pp. 29–30].) Section 1772 simply serves to confirm that the protections of the prevailing wage law extend to workers

employed by contractors or subcontractors. (*Mendoza*, at p. ___ [p. 16].) It was not intended to define or expand the categories of work that are covered by the prevailing wage law, a function adequately served by the provisions that define "public works." Accordingly, because the onboard installation does not qualify as a defined "public work," it is not subject to prevailing wage requirements under section 1772.[17]

Other cases mentioned by the Ninth Circuit purportedly stand for the principle that prevailing wage entitlement may arise even if the work at issue does not meet the statutory definition. Under this approach, work that would not otherwise qualify may be covered so long as *other* associated labor would constitute public work. The conclusion fails because the cases on which it relies do not support it. As noted earlier, section 1720(a)(1)'s definition of public works has three facets. The work (1) entails construction, etc., (2) is done under contract, and (3) is paid for, at least in part, by public funds. (§ 1720(a)(1).) The Ninth Circuit points to *Oxbow*, *supra*, 194 Cal.App.4th 538, and *Cinema West, LLC v. Baker* (2017) 13 Cal.App.5th 194 (*Cinema West*). As discussed below, those cases

---

[17] Although the interpretation of section 1772 is addressed in detail in *Mendoza*, Justice Cuéllar has chosen to critique that analysis at length in a separate opinion filed in *this* case. (See generally dis. opn. of Cuéllar, J., *post*, at pp. 1–24.) That is so even though the same analysis serves as the basis for the dissent in *Mendoza*, albeit in an abbreviated fashion. (*Mendoza*, *supra*, ___ Cal.5th at ___ [pp. 1–5] (dis. opn. of Cuéllar, J.).) It makes little sense to reply here to the dissent when the analytical framework for the majority's analysis is contained in a different case. Suffice it to say that the majority analysis in *Mendoza* rejects the critique set forth in Justice Cuéllar's dissent in this case. To aid the reader, we refer generally to our analysis of section 1772 in *Mendoza, supra,* ___ Cal.5th at ___ [pp. 7–36].

focus on the public funding question, not the nature of the work itself. Accordingly, they do not support an expanded meaning of "public work."

*Oxbow* concerned a petroleum coke facility. Conveyors used to bring coke into the plant were built under a contract using public funds. A separate, privately funded contract was used to build a roof over the conveyors. (*Oxbow*, *supra*, 194 Cal.App.4th at pp. 542–545.) The question in *Oxbow* was whether the privately funded roof work fell within the scope of the prevailing wage law because it was part of a "complete integrated object" that included the publicly funded conveyor work. (*Id.* at pp. 548–550.) *Cinema West* considered a similar issue. There, a city entered into an agreement with a private developer to build a movie theater complex. As part of the agreement, the city used public funds to build an adjacent parking lot. Theater patrons could use the lot, thus facilitating theater development. (*Cinema West*, *supra*, 13 Cal.App.5th at pp. 197–202, 214.) The *Cinema West* court considered whether laborers on the privately funded theater complex were entitled to the prevailing wage because the theater, together with the publicly funded parking lot, formed a "complete integrated object." (*Id.* at p. 215; see *id.* at pp. 210–215.)

Both *Oxbow* and *Cinema West* turned on the phrase "paid for in whole or in part out of public funds." (*Oxbow*, *supra*, 194 Cal.App.4th at p. 547; *Cinema West*, *supra*, 13 Cal.App.5th at pp. 214–215.) All the labor at issue in both cases was indisputably construction work that built or installed facilities on real property. The only question was what construction work could be considered in determining the public funding question. Both cases extended prevailing wage protection because, in their view, all the construction labor, both publicly and privately

financed, was done to achieve a "complete integrated object" that was paid for *in part* by public funds. Neither case is implicated here. (*Oxbow*, at p. 550; see *id.* at p. 552; *Cinema West*, at p. 215.) No private funding was used to build the PTC communications network.

The "complete integrated object" test employed in *Oxbow* and *Cinema West* was derived from *City of Long Beach*, which noted that "construction" involves " '[t]he act of putting parts together to form a *complete integrated object.*' " (*City of Long Beach*, *supra*, 34 Cal.4th at p. 951, quoting 3 Oxford English Dict., *supra*, at p. 794, italics added; see *Oxbow*, *supra*, 194 Cal.App.4th at p. 549; *Cinema West*, *supra*, 13 Cal.App.5th at pp. 210–211.) The *City of Long Beach* court considered whether labor on an animal control facility built with private funds might still qualify as "public work" because the city contributed public funds toward preconstruction expenses, including architectural design, surveying, and other professional fees. (*City of Long Beach*, at p. 950.) The city's contribution was made several years before the definition of "construction" was amended to include preconstruction activities. (*Id.* at pp. 946, 950.) Like *Oxbow* and *Cinema West*, the question in *City of Long Beach* revolved around whether labor done under a privately funded contract could be considered part of "construction . . . paid for in whole or in part out of public funds" under section 1720(a)(1). Because, under the statutory definition operative at the time, preconstruction labor was not included in the definition of "construction," *City of Long Beach* concluded the preconstruction work could not be considered part of the privately funded facility to bring it under prevailing wage requirements. (*City of Long Beach*, at p. 946.)

*City of Long Beach* demonstrates a fundamental limitation on the "complete integrated object" test. An activity that may be necessary or integral to complete a structure or other fixed work is not considered "construction" merely because of that relationship. In *City of Long Beach*, the publicly funded work was necessary before the privately financed facility could be built. But that necessity did not transform the earlier labor into "public work" as it was then defined by statute.

Here, it is the field work that qualifies as "public work" under the statutory definition of construction in section 1720(a)(1). That field work could be accomplished without any installation labor done under the Wabtec contract. Indeed, the distinction between the two activities is even more attenuated than in *City of Long Beach*. In that case the actual building of the facility could not have proceeded at all without the publicly financed preconstruction labor. Yet, because preconstruction labor was not, at the time, included in the definition of "construction," the attempt to meld the two in order to fall under the public funding requirement failed.

It is true that the components installed on trains partner with the field work, in the sense that they ultimately function together as part of an overall communication system. But that interface does not make the onboard installation integral to the completion of the actual construction work. If "construction" included any activity necessary to the *operation* of a public work, that term would bring within its expansive sweep any activity necessary to make the public work functional, whether or not the activity is related to the construction process. That approach has no discernable limiting principle. Here, the labor of those who wrote the software used in the PTC system, as well as those who manufactured the needed computer chips, could be

considered integral to the field work because the overall system would not function without it. For that matter, the towers built on the trackside would be useless without the trains, so arguably the initial building of the railcars would be covered.

Neither *Oxbow* nor *Cinema West* suggests that an activity is considered "construction" simply because it somehow makes other public work functional. In those cases, it was clear that both the publicly and privately funded contracts involved actual building or installation on land. A communication system is not like a manufacturing plant or theater/parking complex. The PTC system involves a "completed integrated object" only if viewed at an unduly high level of abstraction. The overall undertaking is much broader and more complex than building things on land. It is, instead, a multifaceted communications network. Some components of that system may indeed be structures or other fixed works, so that building them might qualify as "construction." But work that is not otherwise defined as "construction" does not become so simply because it plays some role in making the overall communications system functional.

For these reasons, the "complete integrated object" test does not transform the onboard installation into "public work."

Justice Cuéllar's dissents in both this case and *Mendoza* risk mischaracterization of our holdings. Like our holding in *Mendoza*, the holding here is quite narrow. (See *Mendoza*, *supra*, ___ Cal.5th at ___ [p. 36].) We merely address the questions posed by the Ninth Circuit. In this case, those questions are whether the onboard work is included in the definition of public works under section 1720(a)(1), or whether it may be so included as "integral" to other qualifying public

31

work. (See *ante*, at p. 4.) Because Justice Cuéllar's dissent here has included reference to the *Mendoza* case as well, we emphasize again that nothing we say in either case should be read to condone any attempt to ignore the protections or obligations of the prevailing wage law.

## III. CONCLUSION

We answer the Ninth Circuit's question as follows: The onboard work performed under the Wabtec subcontract is not itself "public work" because it is not "construction" or "installation" involving fixed works on land. Further, merely because the onboard work permits the field work and the broader PTC communications system to function does not transform it into "public work."

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

BUSKER v. WABTEC CORPORATION

S251135

Dissenting Opinion by Justice Liu

I agree with Justice Cuéllar that plaintiff John Busker is entitled to prevailing wage protection under Labor Code section 1772 for his work installing electronic components on Metrolink locomotives and rail cars. (Dis. opn. of Cuéllar, J., *post*; all undesignated statutory references are to the Labor Code.) I write separately to explain that Busker's labor is also entitled to prevailing wage protection under section 1720, subdivision (a)(1) (section 1720(a)(1)).

Section 1771 generally provides that the prevailing wage "shall be paid to all workers employed on public works." Section 1720(a)(1) defines "public works" to include "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds." There is no dispute that Busker's work onboard Metrolink trains "was done under contract and paid for with public money." (Maj. opn., *ante*, at p. 8.) The question is whether his work qualifies as "construction" or "installation" work within the meaning of the statute.

The text, purpose, and history of the prevailing wage law indicate that section 1720(a)(1) covers Busker's onboard work. As today's opinion observes, the ordinary meaning of "construction" and "installation" is not limited to fixed works on real property and can encompass work done on rolling stock. (Maj. opn., *ante*, at p. 9.) Instead of accepting the ordinary

1

meaning of these words, however, the court says "the general terms 'construction' and 'installation' are offered as categories of 'public works,' a term which itself has a generally understood meaning that substantially predates the prevailing wage law.  It is *that* definition that gives context to the Legislature's use of the terms construction and installation."  (*Ibid*.)

But this has the analysis backward.  The Legislature defined "public works" by reference to the terms "construction" and "installation"; it did not define "construction" and "installation" by reference to the term "public works."  Today's opinion seems to ask what the terms "construction" and "installation" mean in light of what the term "public works" meant before enactment of the prevailing wage law.  But the Legislature opted to *define what "public works" means* by including "construction" and "installation" as covered work.

Citing early 1900s' dictionary definitions of "public works," the court concludes that the generally understood meaning of the term is limited to fixed work on land and realty. "It is *that* definition," the court says, that informs the terms "construction" and "installation." (Maj. opn., *ante*, at p. 9.)  But courts typically rely on dictionary definitions when a statute uses language that is not otherwise defined.  (See, e.g., *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 244.)  Section 1720, subdivision (a) does not leave "public works" undefined; it provides an expansive and detailed definition of "public works" using language that, the court concedes, is not necessarily tied to land or realty.

In addition, as Busker notes, the Legislature has used different language to define "public works" in other statutes, in some cases making clear that the definition is limited to fixed

structures on real property. For example, Government Code section 4002 defines "public work" as "the construction of any bridge, road, street, highway, ditch, canal, dam, tunnel, excavation, building or structure." The fact that the Legislature defined "public work" to mean certain construction projects on real property in other statutes suggests it did not intend a similar meaning in section 1720(a)(1).

The court says Government Code section 4002 was "not enacted contemporaneously with the statutory language at issue here." (Maj. opn., *ante*, at p. 18.) But Government Code section 4002 "derive[s] from an uncodified statute enacted in 1923." (*Ibid.*) That statute was passed only eight years before the original 1931 version of the prevailing wage law. (*Id.* at p. 5, citing Stats. 1931, ch. 397, p. 910.) It is reasonable to presume that the Legislature was aware of the definition in Government Code section 4002 when it adopted a broader definition of "public works" in the prevailing wage law. (*Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 779, fn. 3 ["the Legislature is presumed to be aware of all laws existent at the time it passes a statute"].)

The 1931 version of the prevailing wage law defined "locality" as the "city and county, county or counties in which the building, highway, road, excavation, or other structure, project, development or improvement is situated." (Stats. 1931, ch. 397, § 4, p. 912.) Today's opinion cites this provision as evidence that the Legislature viewed "public works" as tied to land. (Maj. opn., *ante*, at p. 12 & fn. 11.) But a "project" may be "situated" in a city or county without necessarily being tied to land. The court says the Legislature could not have intended "project" to have such a broad meaning because it "would render that term markedly different from the other listed items." (*Id.* at p. 12,

3

fn. 11.) But that simply assumes the answer to the question presented. If the Legislature intended to restrict public works to real property, why did it include a term ("project") whose meaning so naturally extends beyond real property? The Legislature could have easily omitted the term "project" in the 1931 law but instead chose to include it. (*People v. Valencia* (2017) 3 Cal.5th 347, 357 [" '[a] construction making some words surplusage is to be avoided' "].)

It is also notable that other subparts of section 1720, subdivision (a) refer to real property whereas section 1720(a)(1) does not. (See, e.g., § 1720, subd. (a)(5) [laying of carpet in public buildings]; § 1720, subd. (a)(8) [tree removal work performed on land].) Although subdivision (a)(5) and subdivision (a)(8) were not passed contemporaneously with section 1720(a)(1), their inclusion in the statute shows that the Legislature knows how to limit the definition of "public works" to work on land or realty when it so intends. Further, whereas California's prevailing wage law does not contain an express "fixed work" requirement, other states' statutes do. (See, e.g., 820 Ill. Comp. Stat. Ann. 130/2 [" 'Public works' means all fixed works constructed or demolished by any public body, or paid for wholly or in part out of public funds"]; Wyo. Stat. Ann. § 27-4-402(a)(vii) [" 'Public works' means all fixed works constructed for public use, whether or not done under public supervision or direction, or paid for wholly or in part out of public funds or assessment of property owners or rights users"].)

Even if the Legislature did intend for the words "construction" and "installation" to be read in light of the general understanding of "public works," it is evident that historical usage of the term "public works" did not exclusively apply to fixed works attached to land. In *De La Cruz v. Caddell*

4

*Dry Dock & Repair Co.* (2013) 21 N.Y.3d 530, for example, the New York high court analyzed dictionary definitions of the phrase "public works" from 1891 to 2013 and found that "[a]lthough the illustrative examples given in dictionary entries are frequently fixed structures, it is clear that the notion that a 'public work' must be attached to the land is not part of [the] central meaning" of the term. (*Id.* at p. 538.) Similarly, the United States Supreme Court said in *Title Guaranty & Trust Co. v. Crane Co.* (1910) 219 U.S. 24 that although "public works usually are of a permanent nature and that fact leads to a certain degree of association between the notion of permanence and the phrase," that "association is only empirical, not one of logic. Whether a work is public or not does not depend upon its being attached to the soil . . . ." (*Id.* at p. 33; see also *Housing by Vogue, Inc. v. State, Dept. of Revenue* (Fla.Dist.Ct.App. 1981) 403 So.2d 478, 480 [although all fixed works constructed for the state or its subdivisions qualify as public works, the term public works is not limited solely to fixed works]; *Maurer v. Werner* (Mo.Ct.App. 1988) 748 S.W.2d 839, 841 [rejecting the view that "public works" encompasses only the construction or repair of fixed works].)

The applicability of the prevailing wage law to Busker's onboard work is fully consistent with the statute's purposes. Not only does it further the law's " 'general objective' " of protecting and benefitting employees on public works; it also promotes many of the law's " 'specific goals,' " including attracting talented workers to public works projects and thereby improving the efficiency and quality of such projects, and protecting union workers from underbidding by non-union workers. (Maj. opn., *ante*, at p. 5, citing *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985 (*Lusardi*).) By contrast,

today's opinion authorizes contractors to provide different pay to workers engaged in virtually identical construction or installation tasks, even at the same jobsite, solely on the basis of whether the work occurs on a fixed structure.

The court says "there is at least some reason to believe the Legislature intended to treat work performed on rolling stock differently from that done on fixed works. One of the primary purposes of the law is to protect local labor markets from cheaper outside labor. [Citation.] Paying the prevailing wage to workers constructing a public building located in a particular city or county obviously serves that purpose. But work on rolling stock could conceivably be performed almost anywhere, then delivered to wherever it might be used. This practical reality raises a question about whether the law's purpose is served by paying prevailing wages to workers that may be far away from the location of the governmental entity paying for the work." (Maj. opn., *ante*, at pp. 24–25.)

It is true that "work on rolling stock could conceivably be performed almost anywhere, then delivered to wherever it might be used." (Maj. opn., *ante*, at p. 24.) But today's holding tips the calculus for public entities by incentivizing them to bid down local wages or utilize cheap out-of-market labor to perform such tasks. Why would a public entity choose to have such tasks done locally at local wage rates if they can be done at much lower wages overseas, out-of-state, or in other regions of California? By contrast, in the absence of a wage differential, public entities would have less or no reason to favor those workers over local unionized workers, consistent with the purposes of the prevailing wage law. (See *Lusardi*, *supra*, 1 Cal.4th at p. 987 ["specific goals" of prevailing wage law include "protect[ing] employees from substandard wages that might be paid if

contractors could recruit labor from distant cheap-labor areas" and "permit[ting] union contractors to compete with nonunion contractors"].) In other words, requiring public entities to pay the prevailing wage for onboard work is precisely what would serve the "goal" of the statute: "to give local contractors and labor a fair opportunity to work on public building projects that might otherwise be awarded to contractors who hired cheaper out-of-market labor." (Maj. opn., *ante*, at p. 5.)

I see no discussion in the legislative history — and the court cites none — explaining why it would make sense to exclude construction or installation work performed on rolling stock from the scope of the prevailing wage law. No one disputes that if Busker's electrical installation work had been performed on the wayside instead of on individual Metrolink train cars, his labor would have been covered under the prevailing wage law. By drawing a distinction between identical work performed on the wayside versus on rolling stock — even though the same underlying tools, processes, materials, skills, and expertise would be used to perform that work — today's opinion attributes to the Legislature a limitation that is not evident in the statute's text or legislative history.

Today's opinion notes that in 2012, the Legislature amended section 1720(a)(1) to clarify that " ' "installation" includes, but is not limited to, the assembly and disassembly of freestanding and affixed modular office systems.' (Stats. 2012, ch. 810, § 1.)" (Maj. opn., *ante*, at p. 15.) "The change was enacted to overrule a specific line of [Department of Industrial Relations] decisions that treated the assembly or disassembly of *modular office systems* as 'installation' work only if the systems were bolted, secured, or otherwise mounted to real property." (*Id.* at p. 16.) The Legislature "sought to eliminate what was

7

viewed as an unwarranted distinction between fixed and freestanding modular office systems." (*Ibid.*) The court says this legislative history does not support Busker's argument because "[r]egardless of whether a modular system is fixed or freestanding, it remains the case that office systems are installed in *buildings*. The work takes place in a fixed structure on land." (*Id.* at pp. 16–17.)

But freestanding modular office systems, unlike fixed modular office systems, can be easily moved and transported to other locations; they are not permanently affixed to structures. In that sense, they are similar to rolling stock. And while freestanding modular office systems are typically found in buildings or on land, the same is true with respect to rolling stock, which is typically found in buildings like train stations or on fixed structures attached to land like train tracks. Further, the phrase "includes, but is not limited to" in the 2012 amendment (Stats. 2012, ch. 810, § 1) suggests that the distinction between fixed and freestanding work has significance beyond modular office systems.

Indeed, the legislative history of the amendment explains that the reasoning of the Department of Industrial Relations (Department) in some cases focused to an inordinate degree on whether a construction or installation project was affixed to real property, when the proper focus of its inquiry should have been on the nature of the workers' labor. (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 1598 (2011–2012 Reg. Sess.) as introduced Feb. 6, 2012, pp. 2–3 (Analysis of Assem. Bill No. 1598); see also maj. opn*., ante*, at p. 16 ["the Legislature's focus was on the nature of the work"].) Specifically, the Legislature noted that failing to amend the prevailing wage law to rebut the Department's reasoning would

"mean[] that the intent of [Senate Bill No. 975's] addition of the term 'installation' [into section 1720(a)(1)] has not been completely effectuated" because " '[t]he tools, processes and materials used to build and install "free standing" office modular systems are . . . either analogous or identical to those used in the construction of interior office walls' " and other aspects of installing freestanding modular office systems rely on the same skills and expertise as installing fixed modular office systems. (Analysis of Assem. Bill No. 1598, at p. 3.) Analogous reasoning supports Busker's claim here.

Finally, today's opinion observes that the Department and the Attorney General have consistently excluded rolling stock from coverage under the prevailing wage law. (Maj. opn., *ante*, at p. 23.) But Department decisions "do not have precedential effect," and "[t]he ultimate responsibility for the construction of a statute rests with the court." (*Id.* at pp. 22–23, citing *City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 951.) Here, the Department's interpretation is in conflict with the statute's text and other indicia of legislative intent.

In sum, Busker's work meets the three elements of "public work" set forth in section 1720(a)(1): His work was performed under contract. It was paid for using public funds. And his work onboard Metrolink trains was "construction" or "installation" work, and therefore "public work," within the meaning of section 1720(a)(1). Busker is therefore entitled to the prevailing wage for his onboard labor. Although courts applying California law must abide by today's contrary holding, the Legislature need not. It may amend section 1720, subdivision (a) to make clear that labor that otherwise qualifies as "public work" is not exempt from prevailing wage protection simply because it does

not occur on a fixed structure on land.  Doing so would further the purpose of the prevailing wage law as the Legislature has long understood it.  I respectfully dissent.

**LIU, J.**


**I Concur:**
**CUÉLLAR, J.**

BUSKER v. WABTEC CORPORATION

S251135

Dissenting Opinion by Justice Cuéllar

Over the years, tens of thousands of Californians have been employed on public works — from carpenters to sheet metal workers to electricians and a host of other "laborer[s], worker[s], and mechanic[s]." (Lab. Code, § 1723.)[1] California's prevailing wage law (§ 1720 et seq.) guarantees these workers pay commensurate with those in the local area for work of a similar character (§ 1771). This pay protects them from substandard wages that might be paid if contractors could hire cheaper out-of-market labor — a purpose that harkens back to the law's Depression-era roots. (*Kaanaana v. Barrett Bus. Servs., Inc.* (2021) 11 Cal.5th 158, 165–166 (*Kaanaana*).) It also permits union contractors to compete with nonunion ones; benefits the public through the superior efficiency of well-paid employees; and compensates nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by their public counterparts. (*Id.* at p. 166.) As workers have lost influence in the workplace for a variety of economic and social reasons (Andrias, *The New Labor Law* (2016) 126 Yale L.J. 2, 5–7, 13–40), prevailing wage laws such as California's law have remained a key feature of labor and employment.

---

[1] Further unspecified references are to the Labor Code.

The Legislature determined to whom these prevailing wage protections apply: "to *all workers* employed on public works." (§ 1771, italics added.) Given this broad scope, and the prevailing wage law's critical function, our cases emphasize that we must interpret the law liberally. (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949–950 (*City of Long Beach*).) Over the past decades, the Courts of Appeal and the Department of Industrial Relations (DIR) have fulfilled this obligation in construing section 1772. That section provides: "Workers employed by contractors or subcontractors in the execution of any contract for public work are deemed to be employed upon public work." (§ 1772.) The Courts of Appeal and the DIR have persuasively interpreted this section as providing prevailing wage protection for certain work beyond the codified definitions of "public works" (see §§ 1720–1720.9 [defining " 'public works' "]): Work critically related to the "execution of" a public works contract.

The majority breaks with this history for no good reason. Here and in the other prevailing wage case we also decide today, *Mendoza v. Fonseca McElroy Grinding Co., Inc.* (Aug. 16, 2021, S253574) __ Cal.5th __ (*Mendoza*),[2] it radically constricts the prevailing wage law's scope and undoes an established line of decisions — all under the rubric of judicial modesty. Casting aside our obligation to construe the law liberally, the majority holds that section 1772 does not cover functions or activities not expressly defined as " 'public works.' " (Maj. opn., *ante*, at p. 27; see *Mendoza*, at p. __ [pp. 1–2].) Instead, the majority reasons,

_____

[2]     *Mendoza* contains a full discussion of section 1772, and the majority here simply incorporates that analysis. (Maj. opn., *ante*, at pp. 26–27.)

the section was originally intended simply to clarify that the law extends to workers employed by contractors and subcontractors. (E.g., maj. opn., *ante*, at p. 26; *Mendoza*, at p. __ [pp. 9–10, 12, 14].)

The majority fails to persuade. It papers over section 1772's language. It overturns decades of legal decisions that had established a persuasive, workable framework for interpreting and applying the section. And it presents a strained reading of the prevailing wage law's legislative history. Its interpretation creates odd and pernicious consequences, too: Workers fall outside of the law's scope even though they perform labor critical to building, roadway, and other vital public infrastructure projects. This despite how their labor mirrors or clearly relates to covered work for these projects, and undoubtedly falls within the heartland of the prevailing wage law's concern; and even though their exclusion contravenes the law's purpose by, among other things, encouraging public works employers to employ cheaper workers for labor not defined as "public works," but nonetheless constituting labor as crucial as it is integral to public works projects.

With respect, I dissent.

## I.

### A.

A careful reading of section 1772 readily serves up two early hints that it extends prevailing wage coverage beyond the codified definitions of public works. First, the section covers any workers "employed . . . in the execution of" a public works contract, sweeping broadly in its description of the workers to which it applies. (§ 1772.) That phrase can naturally be understood to cover *any* activity contributing to and critical to

3

the carrying out and completion of the public works project being contracted for (see, e.g., Webster's 11th New Collegiate Dict. (2003) p. 436 [defining "execute" as "to carry out fully," "put completely into effect," or "to do what is provided or required"]) — even if the activity isn't under one of the codified definitions.

Second, the section uses the word "deemed" when it explains what happens to workers engaged in such integral activities. To wit: The laborers "are *deemed* to be employed upon public work." (§ 1772, italics added.) To "deem" something means to treat it "as if it were really something else . . . or . . . has qualities that it does not have." (Black's Law Dict. (11th ed. 2019) p. 523, col. 2.) Lawmakers frequently use the word to establish legal fictions, including by positively "deeming" something to be what it is not in a statute. (*Id.* at pp. 523–524, citing Thornton, *Legislative Drafting* (4th ed. 1996) p. 99.) Here, the word fits logically with section 1772's description of the workers covered; it extends prevailing wage coverage to those working "in the execution of" a public works contract — *deeming their labor* "public work" even if it would not ordinarily fall within the term's definitions.

The majority glosses over these two aspects of section 1772's language. Instead, it presses the argument that the language simply clarifies the category of persons entitled to prevailing wages by indicating that the law applies to employees of contractors and subcontractors performing public work under contract. (See, e.g., *Mendoza, supra,* __ Cal.5th at p. __ [pp. 8–9, 21].) But that reading promptly turns section 1772 into a fifth wheel because of section 1771, which already covers "*all* workers employed on public works" "under contract," including those employed by contractors and subcontractors. (§ 1771, italics

4

added.) Moreover, the majority ignores the significance of "deemed" in the section. It effectively replaces "deemed" with "regarded" or "are," and thereby contends the word simply describes the types of workers covered. (See *Mendoza*, at p. __ [p. 22].) But even under this reading, section 1772 would still be surplusage. By definition, workers engaged in construction-type activities on a publicly funded project are employed on "public work," regardless of whether they work for a contractor or subcontractor. In other words, there is no need to "deem[]" such workers to be employed on public work. (§ 1772.)

The majority also argues that the statutory structure confirms its interpretation. Not so. What the majority reasons is this: article 1 of the law, titled "Scope and Operation," sets the scope of the law by carefully defining the "public works" to which the law applies, whereas article 2, titled "Wages," simply concerns the wages to be paid to workers covered under article 1. (*Mendoza, supra*, __ Cal.5th at p. __ [pp. 9–10, 20–21].) Notice how much this argument depends on article titles — titles that don't fundamentally change a statute's meaning. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602.) The language of a statutory provision such as section 1772 cannot be ignored simply because it might fit more logically in a different part of the Labor Code. (Cf. *Reliable Tree Experts v. Baker* (2011) 200 Cal.App.4th 785, 795 ["[T]he scope of the Prevailing Wage Law is not to be ascertained solely from the [definitions in] section 1720, subdivision (a)(1). Section 1771 [of article 2] is also a part of the Prevailing Wage Law, and its language [covering maintenance work] must be taken into account" (fn. omitted)].)

The majority responds that reading the statutory language here to expand coverage places "undue importance" on

"opaque" text that offers no "limiting principle." (*Mendoza, supra,* __ Cal.5th at p. __ [pp. 21–22].) But section 1772 speaks clearly. It "deem[s]" only those employed "in the execution" of a public works contract to be engaged in "public work." (§ 1772.) This limit ensures that the section covers only work that bears an integral relationship with a public works project and the underlying covered "public work" activity being performed — as defined and constrained by provisions such as section 1720, subdivision (a).[3]

Also providing a clear limit: how the prevailing wage law defines the type of individual it protects. " 'Worker' " as used in the law "includes laborer, worker, or mechanic." (§ 1723.) Pertinent legislative history and DIR job classifications confirm that the law has generally applied only to craftspersons and manual laborers, many of whom perform construction-related tasks. (See Assem. Com. on Labor and Employment, Rep. on Sen. Bill No. 1999 (1999–2000 Reg. Sess.) as amended Aug. 18, 2000, p. 4 ["Historically, workers entitled to prevailing wages . . . are blue collar workers"]; see also Office of the Director, *Director's General Prevailing Wage Determinations* (June 2021) Dept. of Industrial Relations <https://www.dir.ca.gov/oprl /dprewagedetermination.htm>[4] [as of Aug. 11, 2021] [providing

---

[3] Fulfilling a public works contract typically requires a host of tasks that don't bear any real connection to public works. For example, projects may require accounting. And the Positive Train Control (PTC) system here required software development. (Maj. opn., *ante,* at pp. 1, 30.) No one suggests that these tasks, which are ancillary to covered public work, fall within the prevailing wage law's ambit.

[4] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.

links to a range of prevailing wage determinations for blue-collar workers].)  In other words, the language of section 1772 can, in context, only be understood to cover blue-collar workers engaged "in the execution" of a public works contract through construction and related trades — just like their fellow workers engaged in labor under one of the statutory definitions of "public work."

## B.

Over more than four decades, the Courts of Appeal and the DIR have consistently construed section 1772 as covering certain work substantially related to "the execution" of a public works contract, even though that work would not otherwise meet the statutory definition of public work.  These decisions are no surprise given what the statute says — and they don't bind us.  But they deserve serious consideration and offer further insight into what the statute means.  (*Hoyt v. Board of Civil Service Commissioners of the City of Los Angeles* (1942) 21 Cal.2d 399, 402 [the practical construction of a statute by decisions of the Courts of Appeal, covering many years, is entitled to consideration and should not be overruled unless clearly unsupportable]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–13 (*Yamaha*) [courts defer to agency interpretations that are embodied in quasi-legislative regulations, are a product of the agency's expertise and technical knowledge of the issue, or constitute long-standing, consistent, and contemporaneous interpretations].)  We address them in turn.

### 1.

Three appellate decisions have interpreted section 1772.

The first case is *O.G. Sansone Co. v. Department of Transportation* (1976) 55 Cal.App.3d 434, 441 (*Sansone*). At issue was whether the prevailing wage law covered truck drivers who delivered building materials to a public works highway construction site — delivery work that did not represent defined public work. While *Sansone* did not explicitly resolve whether the drivers fell under section 1772, it effectively addressed that question by addressing whether the trucking companies that employed the drivers were subcontractors within the meaning of the prevailing wage law, including under the section. (*Sansone*, at p. 441; see *Williams v. SnSands Corp.* (2007) 156 Cal.App.4th 742, 752 (*Williams*).) The court held that the drivers qualified for prevailing wages because they worked under subcontracts to fulfill "an integral part of" the prime contractor's contractual obligation. (*Sansone*, at p. 445.) As the court explained, the contract obligated the prime contractor to provide the project materials, including aggregate subbase for the roadway. (*Id.* at p. 443.) Rather than acquiring materials from a standard material supplier, the contractor entered into " 'borrow agreements' " with third parties. (*Ibid.*) These agreements allowed access to private sites where aggregate could be extracted from pits, specifically for use on the project. (*Ibid.*) The contractor engaged the trucking companies to deliver that material to the project. (*Ibid.*) The truckers did no construction; their delivery of necessary materials from a dedicated site nonetheless allowed their labor to effectively be "deemed" public work. The court also observed that even truckers making deliveries for standard material suppliers — a task ordinarily independent of construction activity — might be

8

entitled to prevailing wages if the delivery was " 'functionally related to the process of construction.' " (*Id.* at p. 444.)[5]

*Williams*, *supra*, 156 Cal.App.4th 742 embraced *Sansone*. *Williams* concerned truckers who hauled excess rock and sand from construction sites for later use at nonpublic worksites. (*Williams*, at pp. 746–747.) It explained that the critical aspect of *Sansone* and its own determination was whether the trucking represented "an operation truly independent of the performance of the general contract for public work, as opposed to . . . work that was integral to the performance of that general contract." (*Williams*, at p. 752.) Applying this test, the *Williams* court concluded that the rock and sand haulers did not perform covered labor under section 1772. Unlike in *Sansone*, no evidence indicated that the contract or industry custom obligated the lead contractor to do the hauling work. (*Williams*, at p. 753.) Nor did any evidence indicate the contractor directed how the trucking company would deliver the excess materials offsite, or how the offsite location would use the materials. (*Ibid.*) On this record, the removal of materials was "unrelated to the performance of the prime public works contract" and was "no more an integral part of the process of the public works project than the delivery of generic materials to the public works site by a [standard] material supplier." (*Ibid.*)

Finally, we consider *Sheet Metal Workers' Internat. Assn., Local 104 v. Duncan* (2014) 229 Cal.App.4th 192 (*Sheet Metal*).

---

[5] Although *Sansone* refers to the "construction" process (see, e.g., *Sansone*, *supra*, 55 Cal.App.3d at p. 444), its principles would apply to any other type of activity that qualifies as public work. Going forward, I occasionally use "construction" as an umbrella term for all the kinds of labor defined by the statute as public work.

Here the court applied *Sansone* and *Williams* to the offsite fabrication context. *Sheet Metal* explained that the two cases "set forth a general framework for considering whether certain functions are integral to the performance of a public works contract." (*Sheet Metal*, at pp. 205–206.) Under this framework, the court held that certain offsite fabrication work — fabrication of sheet metal components at a permanent and independent offsite plant — did not qualify for coverage under section 1772. (*Sheet Metal*, at pp. 196–197, 214.) The public works contract at issue concerned the upgrade of a community college's facilities, including its heating and cooling system. (*Id.* at p. 196.) The prevailing wage law applied to the workers of the subcontracted sheet metal firm who installed components for the system, as they engaged in "construction" or "installation" under section 1720, subdivision (a)(1). But the law did not apply to the workers who fabricated the components at the firm — work not covered by the "public work" definitions — because they performed labor at a facility too remotely tethered to a requirement or term in the public works contract and done independently of the offsite construction and not integrated into the construction process. (*Sheet Metal*, at pp. 211–212, 214.)[6]

Three factors emerge from *Sansone*, *Williams*, and *Sheet Metal* that help determine whether labor is done in "the execution of [a] contract for public work" under section 1772: whether the labor is (1) functionally related to the construction process; (2) integrated into that process; and (3) done to fulfill

---

[6]    I do not rely on *Sheet Metal* to endorse or develop any particular viewpoint about when section 1772 would apply to offsite fabrication — a question we needn't address here.

the prime contractor's obligation to complete a public works aspect of the project.

Work is functionally related to the execution of the construction process if it requires similar labor, skills, or other natural relationship to covered work, and if the construction could not be completed as contracted for without the work in question. This framework provides a clear limit to prevent coverage for ancillary tasks, which may be required under a contract that includes public work but in no way impact a contractor's construction obligations.

To be "deem[ed] . . . public work" under section 1772, labor often must be both functionally related to the construction *and* integrated into that process. (§ 1772.) The cases provide specific, nonexhaustive examples of integration. Work done at an exclusively dedicated facility established solely to supply a public works project could be considered as integrated into the project. The facility's existence and the work done there are driven entirely by the needs of the public works construction. (See *Sheet Metal*, *supra*, 229 Cal.App.4th at p. 212.) *Sansone* and *Williams* also posit other examples of integration, including where material is delivered and immediately incorporated as part of the flow of construction, or when dirt removal is required for pipe to be laid. (*Sansone*, *supra*, 55 Cal.App.3d at p. 444; *Williams*, *supra*, 156 Cal.App.4th at pp. 753–754.) What generally unites these differing, fact-specific examples: Each reflects labor that is not unduly attenuated from the actual construction work or other defined public work, and instead bears a logical connection to the preconstruction, construction, or postconstruction process. Unlike the federal prevailing wage law, California's version does not appear to include a geographical limitation. (40 U.S.C. § 3142(c)(1) [limiting

coverage to persons "employed directly on the site of the work"].) The integration requirement for section 1772 should not be read to impose one.

Finally, work falling under section 1772 generally fulfills the prime contractor's obligation to complete a public works aspect of the project. If neither the contract nor industry practice nor practical circumstances impose such an obligation, the work done likely cannot be deemed public work. (See *Williams, supra,* 156 Cal.App.4th at p. 753.)

These three factors have provided a rubric for applying section 1772 — one that's not only longstanding, but eminently administrable. Applying these factors, *Sansome, Williams,* and *Sheet Metal* have provided clear guideposts: They have illustrated how courts can construe section 1772 as expanding the scope of the prevailing wage law and can carefully apply it in a fact-intensive manner — consistent with the law's purpose of protecting workers and our obligation to construe the law liberally — without stretching beyond reason what qualifies as labor "in the execution of" a public works contract. (§ 1772.) Or, put differently, without " 'interfere[ing] where the Legislature has demonstrated the ability to make its intent clear and chosen not to act [citation].' " (*City of Long Beach, supra,* 34 Cal.4th at p. 950.)

The Legislature has not amended or repealed section 1772 since the *Sansone-Williams-Sheet Metal* line of cases have been on the books.

The majority nonetheless somehow decides these cases impermissibly interfere with the Legislature's prerogative. (*Mendoza, supra,* __ Cal.5th at p. __ [pp. 21–22, 29].) It further contends that my embrace of these cases essentially calls on

courts to arrogate legislative power. (*Mendoza*, at p. __ [p. 35].) Not at all: Giving *full* effect to section 1772 based on its language and other indicia of legislative purpose is as far from a judicial encroachment into the safeguards provided by the separation of powers (*Mendoza*, at p. __ [p. 35]) as Chico is from Chula Vista. What the appellate courts have been doing since they started interpreting section 1772 is precisely what we rightly expect courts to do when they interpret statutes. (See *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 511, 514 517–518.) By upending decades of authority on section 1772, it would seem that it's the majority that's interfered.

**2.**

The majority's departure from settled law becomes even more puzzling once we consider DIR coverage determinations.

The DIR Director has "quasi-legislative authority to determine coverage of projects or types of work under the prevailing wage laws." (§ 1773.5, subd. (d).) These determinations, and the statutory constructions that undergird them, merit deference if they represent the DIR's long-standing, consistent, and contemporaneous position. (*Kaanaana*, *supra*, 11 Cal.5th at p. 178.) Such is the case here.

The DIR has dutifully applied the approach in *Sansome*, *Williams*, and *Sheet Metal* for effectuating section 1772. In numerous determinations across many years, the DIR has applied the factors laid out in these cases to determine whether particular types of labor fall under the prevailing wage law by virtue of their relationship to defined public work. (See, e.g., Dept. of Industrial Relations, PW Case No. 2008-008 (May 28, 2008) <https://www.dir.ca.gov/OPRL/coverage/year2008/2008-008.pdf> [as of Aug. 11, 2021] [applying *Sansone* and *Williams*

13

to determine that section 1772 did not cover the off-site manufacture of components, such as trusses and wall panels, for an apartment construction project, but did cover the hauling of such components]; Dept. of Industrial Relations, PW Case No. 2014-023 (Nov. 6, 2014) <https://www.dir.ca.gov/OPRL/ coverage/year2014/2014-023.pdf> [as of Aug. 11, 2021] [applying all three cases to conclude that section 1772 covered the dismantling and removal of modular classrooms]; Dept. of Industrial Relations, PW Case Nos. 2018-028, 2018-031 (May 9, 2020) <https://www.dir.ca.gov/OPRL/coverage/year2020/2018- 018%20and%202018-031.pdf> [as of Aug. 11, 2021] [applying all three cases to determine that section 1772 covered commissioning work to ensure that installed heating, ventilation, and air conditioning systems performed according to design and in conformity with operational needs].)

Like the Court of Appeal cases they apply, the agency decisions tell us something about the scope of section 1772 and the practical viability of the more settled interpretation. It may take some judgement to discern whether a particular type of labor has a functional or integrated relationship with contracted-for public work. (See *Mendoza*, *supra*, __ Cal.5th at p. __ [pp. 6–7, 31–32].) But this challenge is not unique to section 1772. Prevailing wage coverage determinations generally require examination of the "totality of the underlying facts" and circumstances bearing on the nature of the work at issue. (*Oxbow Carbon & Minerals, LLC v. Department of Industrial Relations* (2011) 194 Cal.App.4th 538, 550.) In engaging in this type of careful, holistic analysis under section 1772, the DIR and courts have proven up to the task, guided by a longstanding framework applicable across public works projects.

The majority upends this framework, disapproving of the Court of Appeal cases undergirding it and rendering existing administrative decisions relying on it meaningless. (See *Mendoza, supra*, __ Cal.5th at p. __ [pp. 29–30, 33].) Yet its main basis for doing so — legislative history — provides no plausible support.

## C.

Section 1772's legislative history is quite thin. The section has remained substantively unchanged since the Legislature first enacted the prevailing wage law as an uncodified measure in 1931 (*Mendoza, supra*, __ Cal.5th at p. __ [p. 8]), and no materials from then or the law's 1937 codification offer commentary on the section's meaning (see Cal. Code Com. Office, Proposed Labor Code (1936), p. 88).

The majority nonetheless urges that historical sources on section 1772's original intended purpose *mandate* reading the section narrowly: as simply clarifying that the law covers employees of contractors and subcontractors performing defined public work. (*Mendoza, supra*, __ Cal.5th at p. __ [pp. 10–20].) Discerning this purpose from the section's spare historical materials seems like trying to draw blood from a stone. And, ultimately, the majority's read of these materials and historical context proves strained and doesn't come remotely close to justifying its radical interpretation.

The majority begins with the original language of section 1772, which traces back to the 1931 uncodified prevailing wage law. (Stats. 1931, ch. 397, § 1, p. 910.) The relevant text provided that prevailing wages "shall be paid *to all laborers, workmen and mechanics employed by or on behalf of the State of California, or by or on behalf of any county, city and county, city,*

15

*town, district or other political subdivision* of the said state, engaged in the construction of public works, exclusive of maintenance work. *Laborers, workmen and mechanics employed by contractors or subcontractors in the execution of any contract or contracts for public works* with the State of California, or any officer or public body thereof, . . . [or any political subdivision] . . . , *shall be deemed to be employed* upon public works." (*Ibid.*, italics added.) Section 1772 derives from the second sentence, whereas section 1771 derives from the first sentence.

According to the majority: The first sentence covered government workers — those " 'employed by' " the state on public works. (*Mendoza, supra,* __ Cal.5th at p. __, fn. __ [p. 11 & fn. 11].) And the second clarified that the law *also* extended to nongovernment laborers by " 'deem[ing] [them] to be employed upon public works.' " (*Mendoza,* at p. __, fn. __ [pp. 11–12 & fn. 12].) The majority draws a similar inference from the 1937 codification, which split the two sentences into the original versions of sections 1771 and 1772.[7] It reasons that section 1771 originally covered *all* those employed on public works, including government workers, and section 1772 "simply . . . ensure[d] that those employed by a contractor or subcontractor" had "the same protection . . . ." (*Mendoza,* at p. __ [p. 14].) The majority acknowledges that the 1974 legislative amendment to limit section 1771 to contract work potentially renders its reading of section 1772 surplusage, but it attempts

---

[7] Section 1771 as originally enacted applied "to all workmen employed on public works . . . ." (Former § 1771, added by Stats. 1937, ch. 90, p. 243.)

to sidestep this by urging that the section was not originally surplusage. (*Mendoza*, at p. __ [p. 16].)

Yet this sidestep fails. So does the majority's interpretation more broadly, because it hinges on a premise the majority fails to fully substantiate: that the prevailing wage law as originally enacted generally covered government workers. That proposition appears debatable at best. On the one hand, the majority correctly observes that the 1931 and 1937 prevailing wage laws did not expressly exclude government workers (*Mendoza, supra*, __ Cal.5th at p. __, fn. __ [pp. 11, fn. 11, 15]), and it marshals some support from two Attorney General opinions and the early prevailing wage laws of some states (*Mendoza*, at p. __ [pp. 12–13, 16–17]). And the 1931 Act's use of the phrase "employed by or on behalf of" the state can plausibly be read to broadly cover direct government employees and contracted-for employees alike. (Stats. 1931, ch. 397, § 1, p. 910; see *Mendoza*, at p. __, fn. __ [p. 12, fn. 12].) On the other hand, that phrase can also plausibly be read merely to encompass the range of *contract workers* who engaged in labor on public works — irrespective of the precise nature of their relationship with the government, a contractor, or a subcontractor. (See Dept. of Industrial Relations, Div. of Labor Standards Enforcement, Public Works Manual (May 2018) § 2.2, pp. 2–3 [citing, inter alia, *Sansone, supra*, 55 Cal.App.3d at p. 463].) This view finds support in the express exclusion of coverage for government employees in the 1897 precursor to the prevailing wage law (Stats. 1897, ch. 88, § 1, p. 90); the absence of any discussion of such coverage in our cases addressing the uncodified prevailing wage law (see, e.g., *Metropolitan Water Dist. of Southern California v. Whitsett* (1932) 215 Cal. 400); and how many states historically limited their prevailing wage laws

to contract work (Johnson, *Prevailing Wage Legislation in the States* (Aug. 1961) 84:8 Monthly Lab. Rev. 839, 842).

More importantly, we held in *Bishop v. City of San Jose* (1969) 1 Cal.3d 56 (*Bishop*) that the prevailing wage law as originally enacted did not cover government employees. (*Bishop*, at p. 64.) Though the majority offers some potentially tenable critiques of the decision (e.g., *Mendoza, supra*, __ Cal.5th at p. __ [pp. 18–19] [it failed to address how what is now § 1720, subd. (a)(3) appears to cover street, sewer, and improvement work not performed under contract]), *Bishop* nonetheless remains equally plausible, if not more so, compared to the majority's view. That view fails to take into account the impetus behind the prevailing wage law: It emerged to prevent " 'government *contractors*' " from " 'circumvent[ing] locally prevailing labor market conditions by importing cheap labor from other areas' " (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555, italics added), and one of its main purposes has always been to "compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees" (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987; see *Sansone, supra*, 55 Cal.App.3d at p. 459). Under these circumstances, we have reason to think that the purpose of the law did not entail covering government workers.

But suppose the law did apply to these very workers. The majority fails to explain why it would have been necessary to include section 1772 simply to clarify that the law *also* protected those employed by contractors and subcontractors. As originally enacted in 1931 and codified in 1937, the prevailing wage law *unquestionably* applied to work done by contract. In fact, that represented the *primary focus* of the law. (See *Bishop, supra*, 1

Cal.3d at p. 64; *Sansone, supra*, 55 Cal.App.3d at pp. 458–460.) Even the 1960 Attorney General opinion cited by the majority (*Mendoza, supra*, __ Cal.5th at p. __ [pp. 16–17]) acknowledged this reality (35 Ops.Cal.Atty.Gen. 1, 3 (1960)). If the law as a whole so obviously focused on contract work, there should have been no need to clarify that public agencies could not avoid the law by having the work done by contractors instead of their own forces. In other words, the majority not only makes section 1772 redundant today, but also renders the Legislature's original action in enacting the provision as surplusage.

Legislatures don't always manage to write laws that are perfectly clear. But it's doubtful the Legislature used extra words via section 1772 to say nothing new regarding contract labor.

It's likewise doubtful the Legislature enacted the section merely to clarify the *types* of private workers covered. According to the majority, even if the prevailing wage law did not apply to government workers, section 1772 still originally served and continues to serve the purpose of removing any doubt that the law applies to the gamut of contract workers potentially employed on a public works project, from those contracting directly with the government to those formally or informally employed by a contractor or subcontractor. (*Mendoza, supra*, __ Cal.5th at p. __ [pp. 8–9, 19–20].) But the majority provides nothing in the way of case law, legislative history, or historical context to support this alternative view. Indeed, the precursor language to section 1771 swept quite broadly, covering "*all laborers, workmen and mechanics* employed by or on behalf of the State . . . engaged in the construction of public works." (Stats. 1931, ch. 397, § 1, p. 910, italics added.) So too did the original version of section 1771; it covered "*all workmen*

employed on public works." (Former § 1771, added by Stats. 1937, ch. 90, p. 243, italics added.) In other words, the prevailing wage law did not appear to require any clarification regarding the types of private labor covered.

Finally, even if the majority's arguments regarding section 1772's narrow purpose make this case close, that is of no moment. The prevailing wage statute's liberal construction rule *requires* us to select the longstanding, broader interpretation offered by *Sansone* and its progeny. (*City of Long Beach*, *supra*, 34 Cal.4th at pp. 949–950.) The majority doesn't reject this rule; it merely pays lip service to it (*Mendoza*, *supra*, __ Cal.5th at p. __ [p. 4]) and ultimately flouts it in practice.

## D.

The facts of this case underscore why reading section 1772 liberally, to cover critical labor beyond defined "public work" activities, furthers the purpose of protecting and benefitting those employed on public works.

Plaintiff John Busker performed a range of electrical installation tasks for a public works project to create a communication system for Metrolink public transit trains. He was a blue-collar worker (cf., e.g., Public Employer's Guide to FLSA Employee Classification § 900), and his work would indisputably be covered under the prevailing wage law had it been performed on the wayside, rather than onboard rolling stock (maj. opn., *ante*, at pp. 25–26). In other words, he performed the type of work the prevailing wage law targets and he fits within the class of workers the Legislature designed the prevailing wage law to protect.

Busker's onboard labor readily qualifies as "construction" and "installation" work within the meaning of section 1720,

subdivision (a)(1). (Dis. opn. of Liu, J., *ante.*) But even if that were not so, section 1772 naturally extends coverage to his labor. Reinforcing this conclusion is the framework from *Sansone* and subsequent cases.

First, the completion of Busker's onboard work served as a necessary component for Parsons, the prime contractor, to meet its obligation under the prime contract requiring creation of a functional Metrolink rail safety system. The prime contract required Parsons to "deliver[] . . . a fully integrated and fully functional PTC System that has been completely tested" and shown to reliably perform "under full-scale and full-service operation." (See also *Busker v. Wabtec Corporation* (9th Cir. 2018) 903 F.3d 881, 883.) Because the onboard work supplied equipment for the system, the work had to be completed for Parsons to fulfill its contractual duty.

Second, Busker's onboard work was integrally related to the covered wayside work and the PTC system as a whole. The onboard work occurred on-site at the project's railyard and central maintenance facility. Moreover, the onboard work served as a key component in the completely integrated, fully tested system that Parsons had to deliver. The wayside work and the system would both have been useless without the onboard work. Without it, there could be no communication between the trains and the wayside locations, and from the wayside to the centralized control system. In other words, because the onboard work was inherently tied to the wayside work, it cannot be viewed as independent from that work or installation of the PTC system as a whole.

Third, Busker's onboard work related functionally to the covered field work. It's not just that the field equipment and the

PTC system depended on completion of the onboard work. It's also that the electrical installation tasks Busker performed on rolling stock related to analogous installation work being performed just a few feet away, along the wayside. In other words, if there was any distinction existed between onboard and wayside work for purposes of section 1772, it was a not meaningful one: the two sets of labor appear to involve similar underlying tools, processes, materials, skills, and expertise — all going toward the same, integrated project. (Dis. opn. of Liu, J., *ante*, at p. 7.)

Covering Busker's labor based on this three-part framework for applying section 1772 achieves the specific goals of the prevailing wage law. For example, covering workers such as Busker helps attract talented craft workers to public works projects and thereby improves the efficiency and quality of such projects (*Kaanaana*, *supra*, 11 Cal.5th at p. 166) — an especially critical goal for a system installation aimed at preventing collisions and other dangerous train movements for public transportation. It would also protect union workers from underbidding by nonunion workers. (*Ibid.*)

Now consider what the majority's interpretation will encourage contractors to do: easily circumvent the prevailing wage law. Under its interpretation, contractors can simply employ two sets of workers: one set of workers engaged in defined public work and a different set of cheaper workers to perform any work that necessarily facilitates and supports defined work but does not fall under one of the "public work" definitions. That outcome seriously undercuts the prevailing wage law's effectiveness. It essentially enables employers to section off portions of a public works contract in order to circumvent application of the prevailing wage law. As Busker

points out, California Code of Regulations, title 8, section 16100, subdivision (b)(6) states that the "awarding body" must "[e]nsure that public works projects are not split or separated into smaller work orders or projects for the purpose of evading the applicable provisions of Labor Code Section 1771." Classifying Busker's onboard labor as separate or distinct from the wayside labor — even though both bodies of work represent inherently linked aspects of one unified public works project — would do exactly that.

Indeed, the odd consequences of the majority's holding in this case underscore the wayward nature of its interpretation. The idea that the prevailing wage law covers electricians and other skilled or manual work at a railyard and alongside a railway, but excludes coverage for functionally related, integrated, and contractually required work, simply because the worker happened to be working *on* a railcar parked at the railyard, strikes me as an arbitrary and implausible distinction — and one unsupported by any indicia of the prevailing wage law's purpose.

In spite of — and perhaps especially because of — the majority's wholly unjustified constriction of section 1772, courts and the DIR must still strive to liberally construe the other provisions of the prevailing wage law, including its definitions of covered "public work." Justice Liu's dissent, which I join, offers one potential template for doing so. (Dis. opn. of Liu, J., *ante*, at pp. 1–7 [illustrating how the language, legislative history, and purpose of section 1720, subd. (a)(1), mean it can't be read as limited to fixed work on land, and to therefore create an arbitrary distinction between identical installation work performed on the wayside versus rolling stock].)

## II.

Longstanding authority provided a persuasive and workable framework for applying section 1772 to cover certain labor critical to the "execution of" a public works contract and defined "public work." The majority here and in *Mendoza, supra*, __ Cal.5th __ upends this established understanding of section 1772 without justification.

By eviscerating the scope of section 1772, the majority fails to live up to our obligation to construe the prevailing wage law liberally. This failure strikes a heavy blow to the workers of our state. Across public works sites, laborers performing tasks vital to the performance and completion of covered "public work," and public infrastructure projects as a whole, now lack prevailing wage law protections — even if they represent the very type of workers the prevailing wage law is designed to apply to, and even if they perform the very type of labor the law is meant to cover.

With respect, I dissent. I urge the Legislature to amend section 1772 to restore the settled understanding of the section offered by *Sansone* and applied by the DIR: that work "in the execution of" a public work contract encompasses labor performed in preparation for, in furtherance of, or otherwise bearing a critical relationship to defined public work and the public works project as a whole, and that such labor is therefore subject to prevailing wage protections. (§ 1772.)

**CUÉLLAR, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Busker v. Wabtec Corporation

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding** XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S251135
**Date Filed:** August 16, 2021

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

Donahoo & Associates, Richard E. Donahoo, William E. Donahoo; Foley, Bezek, Behle & Curtis, Thomas G. Foley, Jr., Kevin D. Gamarni; Esner, Chang & Boyer, Stuart B. Esner and Holly N. Boyer for Plaintiff and Appellant.

Neyhart, Anderson, Flynn & Grosboll and Benjamin K. Lunch for International Brotherhood of Electrical Workers, Local Union No. 6, as Amicus Curiae on behalf of Plaintiff and Appellant.

Bush Gottlieb, Lisa C. Demidovich and Jason Wojciechowski for International Brotherhood of Electrical Workers Local 11 as Amicus Curiae on behalf of Plaintiff and Appellant.

Altshuler Berzon, Eileen Goldsmith and Zoe Palitz for International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet

Metal Workers' Local Union No. 104 as Amicus Curiae on behalf of Plaintiff and Appellant.

Jones Day, Craig E. Stewart, Eric Tung, Shay Dvoretzky; K&L Gates and Todd L. Nunn for Defendants and Respondents.

Lewis Brisbois Bisgaard & Smith and Lann G. McIntyre for California State Association of Counties, League of California Cities, California Association of Sanitation Agencies, California Special Districts Association and American Public Transportation Association as Amici Curiae on behalf of Defendants and Respondents.

Hanson Bridgett, Adam W. Hofmann and Josephine M. Petrick for Southern California Regional Rail Authority as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stuart B. Esner
Esner, Chang & Boyer
234 East Colorado Boulevard, Suite 975
Pasadena, CA 91101
(626) 535-9860

Richard E. Donahoo
Donahoo & Associates, LLP
440 W. First Street, Suite 101
Tustin, CA 92780
(714) 955-5815

Craig E. Stewart
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
(415) 875-5714